# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 195 | **DATE** | 5/24/2001 |
| **CASE TITLE** | LaFine vs. County of Cook, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion to dismiss treated as a motion for judgment on the pleadings [64] is denied. Enter Memorandum Opinion and Order. Status hearing is set for 6/19/01 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

MD courtroom deputy's initials

**number of notices** 3

MAY 2 9 2001
date docketed

docketing deputy initials

5/24/2001
date mailed notice

ED-7
FILED FOR DOCKETING
01 MAY 25 PM 12: 09

Date/time received in central Clerk's Office

MD
mailing deputy initials

Document Number

108

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LINDA A. LAFINE,                            )
                                            )
        Plaintiff,                          )
                                            )
                                            )    No. 98 C 195
                                            )
COUNTY of COOK, ILLINOIS &                  )
JOSEPH CATALDO,                             )
                                            )
        Defendants.                         )

DOCKETED
MAY 2 9 2001

MEMORANDUM OPINION AND ORDER

Plaintiff, Linda LaFine, claims that provisions of Title IV-D of the Social Security Act,

42 U.S.C. §§ 651 *et seq.*, and implementing regulations of the Secretary of Health and Human

Services ("the Secretary"), create a federal right to have a lien imposed on assets of her ex-

husband obtained through settlement of a personal injury claim and that the defendants violated

that right when they failed to do so. She bases her right of action on the Civil Rights Act of

1871, 42 U.S.C. § 1983. Defendants, the County of Cook, Illinois ("the County"), and Joseph

Cataldo, answered the complaint on November 16, 1998, and a motion for summary judgment

asserting, *inter alia*, the statute of limitations was denied by the Honorable Blanche M.

Manning, to whom this case was previously assigned, *LaFine* v. *County of Cook*, No. 98 C 195,

1999 WL 705679 (N.D. Ill. Aug. 27, 1999). Defendants now seek dismissal, this time pursuant

to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.[1] As

---

[1] Although it is unusual to decide a motion for summary judgment before a 12(b)(6) motion, it appears that Judge Manning initially limited attacks on the pleadings to the limitations issue and treated defendants' original motion to dismiss as one for summary judgment because it was fact bound. The pending motion raises other issues the defendants asserted in their first motion.

defendants have already answered, a motion to dismiss is no longer a viable option. The court, however, will treat the motion to dismiss as one for judgment on the pleadings under Fed. R. Civ. P. 12(c). *See Forseth v. Village of Sussex*, 199 F.3d 363, 367 (7th Cir. 2000). A 12(c) motion, like a motion brought under 12(b), may not be granted unless "it appears beyond doubt that the plaintiff cannot prove any [set of] facts that would support his claim for relief." *Id.* at 368; *GATX Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995). In addition, when evaluating a motion for judgment on the pleadings, this court must view the facts alleged in the complaint in a light most favorable to nonmoving party, *id.*, here, the plaintiff. For the reasons stated below, the motion is denied.

## BACKGROUND

Plaintiff's allegations have been stated in two prior court opinions[2] and need not be repeated in detail here. Pursuant to a judgment for dissolution of marriage entered in 1985, plaintiff's ex-husband, Kevin Wrobel, was required to pay $40 per week in child support to plaintiff. Wrobel failed to make these payments for 11 years. The Illinois Department of Public Aid ("the IDPA") referred plaintiff's case to the Cook County State's Attorney's Office ("the SAO") for enforcement of her child support order.[3] Plaintiff, at some time thereafter, notified

---

[2]*LaFine* v. *County of Cook*, No. 98 C 195, 1999 WL 705679 (N.D. Ill. Aug. 27, 1999); *LaFine* v. *County of Cook*, No. 98 C 195, 1998 WL 483505 (N.D. Ill. Aug. 11, 1998).

[3]Plaintiff alleges that the IDPA has entered into a cooperative agreement with the County to provide the services at issue in the complaint. Defendants' answer that the cooperative agreement is between the IDPA and the State's Attorney of Cook County. (Compl. & Ans. ¶¶ 18-20). *See* 45 CFR § 302.12(a)(2) (State plan must provide that a Title IV-D agency shall "insure that all functions are being carried out properly, efficiently, and effectively;" if functions are delegated to "any other State or local agency or official with whom a cooperative agreement . . . has been entered into . . . the IV-D agency shall have responsibility for securing compliance with the requirements of the State (continued...)

2

Cataldo, the assistant state's attorney allegedly responsible, that Wrobel was engaged in settlement negotiations regarding his pending personal injury lawsuit and that a lien should be placed on his claim. Despite this knowledge, Cataldo took no action to establish a lien, did not notify plaintiff that he intended to do nothing, and consequently prevented plaintiff from protecting her rights, destroying her interest in the settlement. In 1994, Wrobel received $100,000 in settlement of his personal injury claim. Counts I and II are against Cataldo for compensatory and punitive damages, respectively, for violation of plaintiff's federal right created by Title IV-D and implementing regulations to receive child support enforcement action. Count III alleges that the SAO, acting on behalf of Cook County, failed to properly train Cataldo in child support enforcement procedures, depriving her of a property interest protected by the Fourteenth Amendment. Count IV alleges that Cook County, through alleged conduct of the SAO, has a widespread and persistent practice of violating the federally protected rights of Title IV-D clients by failing to take appropriate actions to enforce child support orders and impose liens against real and personal property. Defendants contend that judgment is warranted as a matter of law because (a) the State's Attorney and his agent Cataldo are officers of the State of Illinois, not the County, and the County cannot incur § 1983 liability for an assistant state's attorney's actions; (b) the lawsuit is in fact a suit against the State's Attorney in his official capacity, which would be a suit against the state barred by the Eleventh Amendment; (c) Cataldo was a lawyer representing a public body, the IDPA, in a legal proceeding and therefore enjoys absolute immunity from suit; (d) Title IV-D does not create a federal right in the plaintiff; and (e)

---

[3](...continued)
plan by such agency or officials.")

3

Cataldo is entitled to qualified immunity because neither Title IV-D nor the regulations create a federal right in plaintiff, and even if a right exists, during 1993 and 1994 there was no clearly established statutory or constitutional right of which a reasonable person in Cataldo's position would have known.

## DISCUSSION

Defendants assert in their motion that the complaint does not state a claim under the Due Process Clause, referring apparently to Count III's allegations that the County's failure to train the assistant state's attorneys in child support enforcement violated the Clause. To state a claim under the Due Process Clause, a plaintiff must demonstrate (1) a cognizable property interest; (2) a deprivation of that interest, and (3) a denial of due process. *Buttitta* v. *City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993). Neither party otherwise refers to this constitutional claim, and the court declines to analyze the 12(b) issue without benefit of briefing. Because defendants have the burden of persuasion on their motion, the court will assume that Count III survives it.

Passing this threshold, the court will first address the question whether Title IV-D creates an individual right in the plaintiff. The analysis begins with *Blessing* v. *Freestone*, 520 U.S. 329, 340 (1997). As reiterated there, section 1983 "safeguards certain rights conferred by federal statutes." *Id.* at 340 (citing *Maine* v. *Thiboutot*, 448 U.S. 1 (1980)). Redress through § 1983, however, requires "the violation of a federal *right*, not merely the violation of federal *law*." *Id.* (citing *Golden State Transit Corp.* v. *Los Angeles,* 493 U.S. 103, 106 (1989)). "[T]herefore, a plaintiff must show that the particular federal statute at issue creates specific rights." *Marie O.* v *Edgar*, 131 F.3d 610, 618 (7th Cir. 1997) (citing *Golden State*, 493 U.S. at 106). The Supreme

4

Court has "traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right." *Blessing*, 520 U.S. at 340.

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* at 340-41 (citations omitted). If a plaintiff demonstrates that a federal statute creates an individual right, there is a rebuttable presumption that the right is enforceable under § 1983." *Blessing*, 520 U.S. at 341.

The Supreme Court found in *Blessing* that "the requirement that a State operate its child support program meet a performance standard of 'substantial compliance'[4] with Title IV-D" . . . was not "intended to benefit individual children and custodial parents," but rather was intended to be "the standard . . . for the Secretary to measure the systemwide performance of a State's Title IV-D program," *id.* at 343, adding that the same reasoning applies to the requirement of 42 U.S.C. § 654(3)[5] that each State must establish a child support enforcement unit "'which meets such staffing and organizational requirements as the Secretary may by regulation prescribe.'" *Id.* at 345. The Court held "that Title IV-D does not give individuals a federal right to force a state agency to substantially comply with Title IV-D." *Id.* at 332. At the same time, the Court did not foreclose the possibility that some provisions of Title IV-D give rise to individual rights,

---

[4]The Court cited 45 CFR § 305.20(a)(3)(III) (1995). Part 305 of 45 CFR contains the Secretary's regulations pertaining to "Audit and Penalty."

[5]Section 654 sets out 24 separate requirements for a participating state's plan for child and spousal support.

suggesting that where the petitioner's state agency had collected some support payments but failed to pass through the first $50 of each payment to which the plaintiff-respondent was purportedly entitled under the pre-1996 version of § 657(b)(1), the section "may give her a federal right to receive a specified portion of the money collected on her behalf . . . ." *Id.* at 346. Because the respondent-plaintiff's complaint had not separated out this or other particular rights that might exist within the statutory scheme, the Court remanded the case for the district court to determine whether any specific statutory provision created an individual federal right.[6]

After *Blessing*, in *Davis* v. *O'Hara*, No. M1999-00066-COA-R3-CV, 2000 WL 336749, at *13 (Tenn. Ct. App. Mar. 31, 2000), the court held that certain child support enforcement provisions of Title IV-D did not create individual rights, although describing it as a "close question." Similarly, in *Brinkley* v. *Hill*, 981 F. Supp. 423 (S.D. W. Va. 1997), the court dismissed numerous specific claims alleged to create statutory rights under Title IV-D, still reserving the possibility that Title IV-D creates rights other than the ones alleged. To the contrary, in *Young* v. *Anderson*, No. S-95-942 (E.D. Cal. Jan. 6, 2000), the district court held that custodial parents who are entitled to receive child support enforcement services to establish, modify or enforce a child support order had an enforceable right to receive parent location services from California under § 654(4) and (8), and that custodial parents residing in another state who are otherwise eligible had an enforceable right under § 654(4) to child support services.

---

[6]*See Vanscoter* v. *Sullivan*, 920 F.2d 1441 (9th Cir. 1990) (decided before *Blessing*; affirmed lower court injunction requiring compliance with Title IV-D, 42 U.S.C. § 657(b)(2)-(4), that state agency pay custodial parent pass-through payments for child support withheld from wages in the month when due, and directing agency to give periodic notice to custodial parents when support payments have been collected on their behalf); *King* v. *Bradley*, 829 F. Supp. 989 (N.D. Ill. 1993) (also concluded that pass-through provision created enforceable right).

The Seventh Circuit has not yet addressed, post *Blessing,* the issue of rights created by Title IV-D, although it has applied *Blessing* to claims for enforcement of other statutory schemes in which Congress endeavors to effect its policy objectives by providing funds to the states, while giving a federal executive department the power to cut off funds to states that do not maintain compliance with federal requirements. In *Marie O.*, 131 F.3d at 618-19, the court applied *Blessing* and concluded that the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1471 *et seq.*, created enforceable rights in children to a statewide system with statutorily identified 14 minimum components of the state plan, such as "a timely, comprehensive, multidisciplinary evaluation" of each infant and toddler with a disability in the State, an individualized family service plan, and a "comprehensive system of personnel development," rejecting the defendants' arguments that the statutory requirements were too vague to be enforced.[7] In *Paramount Health Systems, Inc.* v. *Wright*, 138 F.3d 706 (7th Cir. 1998), the court rejected Illinois' argument that the plaintiff provider of medical services under the federally-funded Medicaid program had no right to sue, finding the providers intended beneficiaries of the statutory provisions requiring states to use their Medicaid funds to reimburse providers at Medicare rates. *Id.* at 707 (citing *Blessing*, 520 U.S. at 340, and *Wilder* v. *Virginia Hospital Ass'n*, 496 U.S. 498, 508-09 (1990)). In *Indianapolis Minority Contractors* v. *Wiley*, 187 F.3d 750 (7th Cir. 1999), on the other hand, the court ruled that where Congress required that at least 10 percent of federal grant funds be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals, the statutory scheme did not

---

[7]The court stated, "We do not find any of these requirements to be so vague or unclear as to be unenforceable." 131 F.3d at 620.

create enforceable rights in any individual minority contractor.  It is against this backdrop that this court evaluates Plaintiff's complaint.

## Plaintiff's Claims

Plaintiff alleges that Cataldo's failure to create and enforce a lien on Wrobel's assets violated §§ 651, 652(a)(1), 652(h), 654(4)(B), and 654(13) of Title IV-D and 45 CFR §§ 303.3, 303.6 and 303.103.  These same statutory provisions and federal regulations, plaintiff contends, were violated by the SAO, on Cook County's behalf, in failing to properly train Cataldo and engaging in a custom of failing to properly enforce child support orders.  Section 651 authorizes appropriation of funds on a yearly basis in order to achieve the stated goals of Title IV-D, which include "enforcing the support obligations owed by noncustodial parents to their children and the spouse (or former spouse) with whom such children are living . . . ."[8]  Section 652(a)(1) requires the Secretary "to establish such standards for State programs for locating noncustodial parents, establishing paternity, and obtaining child support and support for the spouse (or former spouse) with whom the noncustodial parent's child is living as he determines to be necessary to assure that such programs will be effective."  Section 652(h) requires the Secretary to "include standards establishing time limits governing the period or periods within which a State must

---

[8]The full text of § 651 follows:

§ 651.  Authorization of appropriations
For the purpose of enforcing the support obligations owed by noncustodial parents to their children and the spouse (or former spouse) with whom such children are living, locating noncustodial parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for assistance under a state program funded under part A of this subchapter [Temporary Assistance to Needy Families] for whom such assistance is requested, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part.

accept and respond to requests (from States, jurisdictions thereof, or individuals who apply for services furnished by the State agency under this part or with respect to whom an assignment pursuant to section 608(a)(3)[9] of this title is in effect) for assistance in establishing and enforcing support orders including requests to . . . initiate proceedings to establish and collect child support awards."

Section 654 sets out requirements for a State plan for child and spousal support. Subsection (4)(b) requires the plan to provide that the State will "enforce any support obligation established with respect to (i) a child to whom the State provides services under the plan; or (ii) the custodial parent of such a child."  Under subsection (13), as pertinent here, the plan must provide that the State will comply with "such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for . . . collecting support payments . . . ."

The regulations impose more specific requirements.  At 45 CFR § 303.3, the Title IV-D agency "must attempt to locate all noncustodial parents," using appropriate sources and repeated efforts.  At 45 CFR § 303.6, the title IV-D agency must "maintain and use an effective system for . . .  [t]aking any appropriate enforcement action . . . unless service of process is necessary, within no more than 30 calendar days of identifying a delinquency or other support-related noncompliance with the order [of support], whichever occurs later" (and 60 days where service of process is required).  Section 303.103 requires the IV-D program to "have in effect and use

---

[9]Section 608(a)(3) denies assistance to public aid recipients who do not assign certain support rights to the State.

procedures which require that a lien will be imposed against the real and personal property of an absent parent who owes overdue support and who resides or owns property in the State."[10]

## Application of *Blessing* Standard

The first inquiry under *Blessing* is whether Congress intended that the provision(s) benefit the plaintiff. In this instance, plaintiff argues, "[T]here can be no dispute that Congress intended these statutes to benefit Ms. LaFine individually, as well as other custodial parents . . . ," citing *Mason* v. *Bradley*, 789 F. Supp. 273, 276 (N.D. Ill. 1992), and *Oliphant* v. *Bradley*, 91 C 3055, 1992 U.S. Dist. LEXIS 88975, *1820 (1992 WL 153637) (N.D. Ill. Feb. 19, 1992). *Mason* concluded that "Congress evinced an intent to benefit both AFDC families and local welfare budgets. The former purpose is evident particularly in the $50 pass-through provision entitling AFDC families to the first $50 collected each month by a Title IV-D agency from a delinquent child support payer. 42 U.S.C. § 657(b)(1)." 789 F. Supp. at 276. There the court cited several cases reaching the same conclusion: *Oliphant,* 1992 WL 153637, *7 ("The plain language of this statute indicates a clear intent to benefit those owed child support."); *Carelli* v. *Howser*, 923 F.2d 1208, 1211 (6th Cir. 1991) (Congress had dual purpose of recouping welfare funds and to protect needy families); also *Howe* v. *Ellenbecker*, 774 F. Supp. 1224, 1229-30 (D.S.D. 1991); *Behunin* v. *Jefferson County Dept. of Social Services*, 744 F. Supp. 155, 157-58 (D. Colo. 1990); *Beasley* v. *Harris*, 671 F. Supp. 911, 921 (D. Conn. 1987); and noting to the

---

[10]Although not mentioned by the defendants, since this case has been filed, the federal regulations have been changed to conform with the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and 45 CFR § 303.103 has been removed. Pub. L. 104-193, 110 Stat. 2015. The injury which plaintiff claims, however, occurred while the regulation was in effect and the case is analyzed under then-existing regulations

contrary, *Wehunt v Ledbetter*, 875 F.2d 1558, 1565 (11th Cir. 1989) (Congress was primarily concerned with recouping welfare expenditures). *See also King*, 829 F. Supp. at 992 ("Title IV-D is intended to benefit plaintiffs [who alleged State's failure to comply with Title IV-D]").[11]

To support their position, defendants merely refer to *Blessing*, without exposition of the Court's opinion. In *Blessing*, the Court decided that the "substantial compliance" language was "not intended to benefit individual children and custodial parents. . . ." 520 U.S. at 343, 117. Rather, the Court reasoned, "the standard is simply a yardstick for the Secretary to measure the systemwide performance of a State's Title IV-D program." *Id.* Rather than a sweeping conclusion applicable to the entire title, however, the Court instructed the lower court to consider the question with respect to specific provisions of Title IV-D.[12] Thus, this court should examine the specific provisions at issue to determine whether they were intended to benefit persons such as the plaintiff. A lien on Wrobel's assets would have served the purpose of reimbursing the State for public aid expended for the plaintiff's family support and, depending on the amount expended compared to the amount of support due the parent, could mean that plaintiff was entitled to money herself (or to the reduction of any reimbursement she might owe the State at a later time). At the pleading stage, a monetary benefit to plaintiff will be assumed. Unlike the provisions discussed in *Blessing*, this is not a tool for the Secretary's audit but a provision

---

[11]Judge Lindberg dismissed the complaint without prejudice, and on a motion to dismiss the amended complaint, then titled *King* v. *Wright*, No. 92 C 1564, 1995 WL 506062, at *6 (N.D. Ill. Aug. 18, 1995), he reached the same conclusion as to congressional intent.

[12]"Only by manageably breaking down the complaint into specific allegations can the District Court proceed to determine whether any specific claim asserts an individual right." *Blessing*, 520 U.S. at 344.

directed at fulfilling the language of § 651, which recites a policy to "[assure] that assistance in

obtaining support will be available . . . to *all* children *(whether or not eligible for [federally*

*funded public assistance]* for whom such assistance is requested." (emphasis added.)

Defendants argue, however, that plaintiff still does not have an enforceable right under

Title IV-D because, referring to language in *Blessing,*

> [a] State substantially complies with Title IV-D when it provides most mandated
> services (such as enforcement of support obligations) in only 75 percent of the
> cases reviewed during the federal audit period.  45 C.F.R. 305.20(a)(3)(iii) . . . .  It
> is clear then that even when a State is in "substantial compliance" with Title IV-
> D, any individual plaintiff might still be among the 10 or 25 percent of persons
> whose needs ultimately go unmet.

*Blessing,* 520 U.S. at 344.  Some courts have relied on this language to conclude, despite finding

congressional intent to benefit plaintiffs and sufficient specificity to be within judicial

competence, that the 75 percent standard defeats the plaintiff's statutory right.  *See Davis,*

2000 WL 336749, at \*13 ("Inasmuch as Congress obviously envisioned that states would achieve

less than one hundred percent (100%) compliance with many of Title IV-D's provisions, . . . we

conclude that, as a general rule, Congress did not intend to confer upon individual recipients of

Title IV-D services an enforceable right to receive those services.").  This court respectfully

disagrees for several reasons.  First, the Court in *Blessing* specifically held open the question

whether specific provisions other than the substantial compliance/sufficient staff provisions were

enforceable.  If the quoted language was meant to have foreclosed *all* individual rights under

Title IV-D, the Court would not have remanded the case.  Second, Congress in enacting Title

IV-D must have been cognizant of a long line of cases beginning with *King* v. *Smith,* 392 U.S.

309 (1968), in which the Court has decided claims of individual recipients or classes of recipients

12

that policies of a state welfare agency violate the Social Security Act.[13]  In historic context,

Congress must have assumed that mandatory statutory language meant the courts would interpret

the new provisions as it had in these earlier cases.  It is counterintuitive to believe that Congress

authorized multimillion-dollar grants to States with the expectation that the only enforcement of

federal requirements would be through the audit process.  *See Wright* v. *City of Roanoke*

---

[13]In *Thiboutot*, the Court reviewed past holdings where statutory claims under the Social
Security Act were allowed to proceed:

> [O]ur analysis in several § 1983 cases involving Social Security Act (SSA)
> claims has relied on the availability of a § 1983 cause of action for statutory
> claims.  Constitutional claims were also raised in these cases, providing a
> jurisdictional base, but the statutory claims were allowed to go forward, and were
> decided on the merits, under the court's pendent jurisdiction.  In each of the
> following cases § 1983 was necessarily the exclusive statutory cause of action
> because, as the Court held in *Edelman* v. *Jordan*, 415 U.S [651], . . . 673-674, 94
> S. Ct. [1347], . . . 1360- 1361; *id.*, at 690, 94 S. Ct., at 1369 (Marshall, J.,
> dissenting), the SSA affords no private right of action against a State. *Miller* v.
> *Youakim*, 440 U.S. 125, 132, and n. 13, 99 S. Ct. 957, 963, 59 L. Ed. 2d 194
> (1979) (state foster care program inconsistent with SSA); *Quern* v. *Mandley*, 436
> U.S. 725, 729, and n.3, 98 S. Ct. 2068, 2072, 56 L. Ed. 2d 658 (1978) (state
> emergency assistance program consistent with SSA); *Van Lare* v. *Hurley*, 421
> U.S. 338, 95 S. Ct. 1741, 44 L. Ed. 2d 208 (1975) (state shelter allowance
> provisions inconsistent with SSA); *Townsend* v. *Swank*, 404 U.S. 282, 92 S. Ct.
> 502, 30 L. Ed. 2d 448 (1971) (state prohibition against AFDC aid for college
> students inconsistent with SSA); King v. Smith, 392 U.S. 309, 311, 88 S. Ct.
> 2128, 2130, 20 L. Ed. 2d 1118 (1968) (state cohabitation prohibition inconsistent
> with SSA). *Cf. Hagans* v. *Lavine*, 415 U.S. 528, 532-533, 543, 94 S. Ct. 1372,
> 1376-1377, 1382, 39 L. Ed. 2d 577 (1974) (District Court had jurisdiction to
> decide whether state recoupment provisions consistent with SSA); *Carter* v.
> *Stanton*, 405 U.S. 669, 670, 92 S. Ct. 1232, 1233, 31 L. Ed. 2d 569 (1972)
> (District Court had jurisdiction to decide whether state absent-spouse rule
> consistent with SSA).

448 U.S. at 5.

*Redevelopment & Housing Authority*, 479 U.S. 418, 428 (1987) ("HUD's generalized powers to audit, enforce annual contributions contracts, and cut off federal funds are insufficient to indicate a congressional intention to foreclose § 1983 remedies . . . . HUD has the authority to audit, but it does not do so frequently . . . . There are no other mechanisms provided to enable HUD to effectively oversee the performance of the some 3,000 local PHA's across the country."). Third, the 75 percent audit provisions address a problem that is not present in other welfare programs. Unlike programs such as Temporary Assistance to Needy Families under Title IV-A, IDEA, or Medicaid, establishment of support is not entirely within the power of the Title IV-D agency. The state agency can grant cash assistance or an education plan for every eligible individual, but it cannot always locate a nonsupporting parent, establish paternity or obtain enforcement of a support order. *See Young* v. *Anderson*, No. S-95-942 n.11(E.D. Cal. Jan. 6, 2000) ("[W]hile a state must provide paternity establishment services to all eligible individuals [under § 652(g)], it need only successfully establish paternity for 90% of those individuals."). Thus, the audit guidelines require only reasonable rates of success and contain financial incentives for better performance. It is a leap of logic, however, to conclude that these measures are intended as laxness towards state agencies. The statutory scheme is replete with mandatory language, but, in defendants' view, Title IV-D agencies are free to disregard these mandates in at least 25 percent of their cases. Even if one made this leap of logic, it would support at most an affirmative defense where the agency might demonstrate that although it failed to place a lien on assets in plaintiff's case, it had done so in 75 percent of the cases and was therefore in compliance with federal law. For all of these reasons, the court concludes, along with the majority of courts, that

Congress intended to benefit individuals such as the plaintiff when it enacted §§ 651; 652(a)(1); 652(h) and 45 CFR § 303.6; and § 654(4)(b) and (13), and 45 CFR § 303.103.

The second inquiry is whether the right assertedly protected by the statute is so vague and amorphous that its enforcement would strain judicial competence. The heart of the issue is the statutory delegation to the Secretary of the obligation to establish standards for obtaining child support for the intended beneficiaries (§ 652(a)(1)) and the regulations promulgated by the Secretary, which, *inter alia*, require the IV-D agency to "have in effect and use procedures which require that a lien will be imposed against the real and personal property of an absent parent who owes overdue support and who resides or owns property in the State," 45 CFR § 303.103, and to do so within 30 (or 60) days of identification of the source of support. Unlike the "substantial compliance" and "adequate staffing" provisions at issue in *Blessing*, this provision is neither vague nor amorphous and is readily comparable to the minimum components of a state plan under IDEA discussed in *Marie O.*, where the court found them within judicial competence.[14]

The third inquiry is whether the provisions giving rise to the asserted right are couched in mandatory, rather than precatory, terms. Again, *Marie O.* passed this test.[15] Title IV-D includes similar mandatory terms. Section 654 provides that a State plan for child . . . support must . . . provide that the State will . . .

---

[14]Referring to 14 minimum components of a state plan, the court stated, "There is no ambiguity here; we do not find any of these requirements to be so vague or unclear as to be unenforceable." *Marie O.*, 131 F.3d at 620.

[15]"It is clear that Congress in exchange for the federal funds granted under Part H." intended to require the states to undertake specific and concrete obligations to eligible individuals." *Marie O.*, 131 F.3d at 620.

(B) enforce any support obligations established with respect to —
        (i) a child with respect to whom the State provides services
        under the plan; or
        (ii) the custodial parent of such child; [and]

                              * * *

(13) provide that the State will comply with such other
requirements and standards as the Secretary determines to be
necessary to the establishment of an effective program for . . .
collecting support payments . . . ,

i.e, the regulations. Title IV-D, like Part H in *Marie O.*, reflects that Congress, in exchange for

the federal funds granted, intended to require the states to undertake specific and concrete

obligations to eligible individuals, including the timely placement of liens on property of parents

delinquent on their support obligations.[16] Plaintiff having established that all three inquiries set

out in *Blessing* are satisfied, the court finds that the complaint states a claim for violation of

federal statutory rights, not merely violation of federal law.

## Availability of § 1983 Action

    Once the existence of a federal right is established, there is a presumption that the right is

enforceable under § 1983, but that presumption may be rebutted if Congress intended to

foreclose a remedy "either expressly by forbidding recourse to § 1983 in the statute itself, or

impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual

---

[16]This case is unlike *Indianapolis Minority Contractors*, where the court ruled that the 10
percent minority set-aside under a federal highway funding scheme did not create individual rights
in minority contractors because the statutes provided only very generally the obligations that
recipients of federal highway dollars must fulfill, and even though the regulations were specific, they
focused on structuring their programs to maximize opportunities for minority businesses but did not
extend any guarantee that any one disadvantaged group or individual would receive a contract or
other benefit. Here, by contrast, § 652 intends to "[assure] that assistance in obtaining support will
be available under this part to all children . . . for whom such assistance is requested . . . ."

§ 1983 enforcement." *Blessing,* 520 U.S. at 330; *Indianapolis Minority Contractors*, 187 F.3d at 750. Here the defendants have not argued that Congress in Title IV-D intended to foreclose a § 1983 remedy, and in fact *Blessing* reached the conclusion that Congress has not foreclosed this remedy. 520 U.S. at 348.[17]

At the end of this long discussion, however, it remains to be seen whether plaintiff can prove any set of facts that would entitle her to relief. At a minimum in counts I and II, it appears that she would have to demonstrate that the assignment of her claims against Wrobel to IDPA foreclosed her from proceeding against him independently or that she was otherwise foreclosed by the conduct of Cataldo, that Cataldo violated his duties under the specified sections of Title IV-D and the regulations, and that she was actually damaged as a result by losing some property interest that she was otherwise entitled to receive. But for present purposes, the court concludes that plaintiff has a cognizable statutory claim under Title IV-D as well as a due process claim.

## Sovereign Immunity and Plaintiff's Claims against Cook County

The court must next address defendants' arguments that the State's Attorney and his agent Cataldo are officers of the State of Illinois, not the County, that the County cannot incur § 1983 liability for an assistant state's attorney's actions; and that the lawsuit is in fact a suit against the State's Attorney in his official capacity, which would be a suit against the State barred by the Eleventh Amendment. Plaintiff insists that her suit is not against the State's Attorney or his office, but rather the County because of the County's involvement in child support

---

[17]"[W]e agree with the court of appeals that the Secretary's oversight powers are not comprehensive enough to close the door on § 1983 liability."

17

enforcement, specifically by failing to train assistant state's attorneys such as Cataldo in child

support enforcement procedures[18] and for its widespread custom of violating the rights of persons

similarly situated to plaintiff.[19]

When a municipality itself causes a constitutional violation through a governmental

policy or custom, as opposed to a *respondeat superior* theory of liability, the municipality may be

found liable under § 1983. *Monell* v. *Dep't of Social Services*, 436 U.S. 658, 690-695 (1978).

States, state agencies, and, at times, state officials, however, are shielded from damages under §

1983 by virtue of the Eleventh Amendment. *Garcia* v. *City of Chicago*, 25 F.3d 966, 969 (7th

Cir. 1994) ("The Eleventh Amendment prohibits federal courts from deciding suits brought by

private litigants against states or state agencies, and that prohibition extends to state officials

acting in their official capacities) (citing *Will* v. *Mich. Dep't of State Police*, 491 U.S. 58, 71

(1989)). "Whether a particular official is the legal equivalent of the State itself is a question of

that State's law . . ., and the Illinois Supreme Court decided in 1990 that State's Attorneys are

state officials." *Id.* (citing, among other cases, *Ingemunson* v. *Hedges*, 549 N.E. 2d 1269 (Ill.

1990)). *See also Hernandez* v. *Joilet Police Dep't*, 197 F.3d 256, 265 (7th Cir. 1999); *McGrath*

v. *Gillis*, 44 F.3d 567, 571 (7th Cir. 1995). Counties, on the other hand, do not enjoy Eleventh

Amendment immunity. *DeGenova* v. *Sheriff of DuPage County*, 209 F.3d 973, 975 (7th Cir.

---

[18]The complaint, however, alleges that the violation "was caused by the inadequate training that Defendant Cataldo received from the Cook County State's Attorney's Office in the area of child support enforcement." (Compl. ¶ 65.)

[19]This is not a putative class action, so the court is interested to know whether plaintiff is entitled to any relief under Count IV that would not be available to her under Counts I–III.

2000). Hence, it is no surprise that plaintiff chose to sue Cook County as opposed to the State of Illinois or the State's Attorney's Office.[20]

Although Cook County is not entitled to sovereign immunity under the Eleventh Amendment, the court must still examine counts III and IV to determine whether they state a claim upon which relief may be granted. Plaintiff's allegations against the county are as follows:

(1) the SAO, an entity that is the final policymaking authority for Cook County, trained Cataldo on behalf of Cook County;

(2) Cataldo and other assistant state's attorneys received inadequate training, and the inadequacy of their training is so obvious that Cook County's failure to take action amounted to deliberate indifference;

(3) "Defendant Cook County should be held liable for Defendant Cataldo's violation of Plaintiff LaFine's federal rights created by 45 C.F.R. § 303.6 and 45 C.F.R. § 303.103 [and for Cataldo's violation of plaintiff's Fourteenth Amendment due process rights], because the violation was caused by the inadequate training he received from the [SAO] in the area of child support enforcement" (Compl. ¶¶ 56 & 57);

(4) "Both the Cook County State's Attorney, and Defendant Cook County, knew or should have known that the violation of IV-D clients federally protected rights by

---

[20]Plaintiff was not, however, barred by the Eleventh Amendment from suing a state official for prospective injunctive relief. *See Will* v. *Mich. Dep't of State Police*, 491 U.S. at 71 n.10; *B.H. Papasan* v. *Allain*, 478 U.S. 265, 276-78 (1986) (citing *Ex parte Young*, 209 U.S. 123 (1908)); *Marie O.*, 131 F.3d 615.

Assistant State's Attorneys was a repeated and widespread practice" (Compl. ¶ 71); and

(5)     "The widespread and persistent violation of IV-D clients federally protected rights constitutes a policy which was adopted by Defendant Cook County, and therefore, Defendant Cook County should be held liable for the violation of Plaintiff LaFine's federally protected rights." (Compl. ¶ 72.)

Plaintiff insists that these allegations seek to impose liability against Cook County for its own actions, not merely as the *respondeat superior* of the SAO. *City of Canton, Ohio* v. Harris, 489 U.S. 378, 388 (1989), holds that a municipality may be held liable under § 1983 for failure to train its employees if that failure to train amounts to deliberate indifference. Plaintiff's complaint attempts to fit this case within *City of Canton*'s holding by alleging that the SAO, the entity responsible for supervising and controlling assistant state's attorneys[21], trains assistant state's attorneys on Cook County's behalf. Plaintiff also alleges that the SAO is Cook County's final policymaking authority.

The court cannot say at this point in the litigation that plaintiff cannot prove any set of facts to support its claim. Although the contract attached as Exhibit 1 to plaintiff's complaint states in its opening paragraph that "the Illinois Department of Public Aid . . . and the Cook County State's Attorney . . . in consideration of the mutual covenants contained herein, agree as follows . . . ," the President of the Cook County Board of Directors signed the contract and at

---

[21]*See Houston* v. *Cook County*, 758 F. Supp. 1225, 1227 (N.D. Ill. 1990) (" . . . Assisant State's Attorneys [are] staffers who act solely under the supervision and control of the Cook County State's Attorney.").

20

least one provision might be interpreted as imposing a duty on Cook County.[22] Section 10-3.1 of the Illinois Public Aid Code, cited in support by both parties, also casts some doubt on defendants' claims that the IDPA did not contract with Cook County since this section provides that the IDPA may enter into contracts with "local governmental units," 305 ILCS § 5/10-3.1, and the SAO does not appear to qualify as a "local governmental unit" as defined by the Code. *See* 305 ILCS § 5/2-14 (defining "local governmental unit" as "[e]very county, city, village, incorporated town or township charged with the duty of providing public aid under Article VI . . ."). Defendants have pointed to no language in that statutory section granting the IDPA authority to contract directly with the SAO. While Cook County's involvement may ultimately prove insufficient to render it liable under § 1983, the court is mindful that this is a motion for judgment on the pleadings and will not here engage in the type of analysis more appropriately undertaken on a summary judgment motion or at trial. As such, the County is not entitled to judgment on the pleadings for counts III and IV.

## Absolute Immunity

In counts I and II, plaintiff seeks to hold Cataldo liable for his alleged failure "to take appropriate action to discover Kevin Wrobel's assets, establish a lien, or investigate Plaintiff LaFine's claims regarding Kevin Wrobel's settlement negotiations or lawsuits." (Compl. ¶ 44.) Absolute immunity, as the name suggests, provides "absolute protection from damage liability,"

---

[22]Part III, Section C.5 first states that the SAO "agrees to comply with the Federal Office of Management and Budget Circular A-128 requirements concerning single audits," but goes on to order that "[l]ocal governments that receive $1,000,000 or more a year in Federal financial assistance must have an audit performed in accordance with the above referenced circular."

*Buckley* v. *Fitzsimmons*, 509 U.S. 259, 269 (1993), and is of a "rare and exceptional character."

*Cleavinger* v. *Saxner*, 474 U.S. 193, 202 (1985). The presumption is that qualified rather than

absolute immunity is sufficient to protect government officials in the exercise of their duties.

*Burns* v. *Reed*, 500 U.S. 478, 486-87 (1991). (Qualified immunity insulates government officials

performing discretionary functions from damages unless their conduct violates "clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Buckley*, 509 U.S. at 268 (citations and internal quotation marks omitted).) "[T]he degree of

immunity prosecutors are afforded depends on their activity in a particular case. If a prosecutor's

function is judicial or quasi-judicial, he is entitled to absolute immunity from suit, but if the

function was administrative or investigatory, he is only entitled to qualified immunity."

*Anderson* v. *Simon*, 217 F.3d 472, 475 (7th Cir. 2000). Cataldo bears "the burden of showing that

such immunity is justified for the function in question." *Buckley,* 509 U.S. at 269 (citation and

internal quotation marks omitted).

Plaintiff argues that Cataldo's role at the time was investigative (identifying Wrobel's

asset and placing a lien), activity akin to an administrator or investigator rather than being closely

associated with the judicial process. She relies on *Buckley*, where the Supreme Court found that

criminal prosecutors who had performed investigative functions when they were evaluating

evidence prior to determining whether probable cause to arrest existed were not functioning as

advocates for the State and not absolutely immune. *See also Reese* v. *May*, 955 F. Supp. 869,

877 (N.D. Ill. 1996) (officer's initial stop and subsequent investigation of authenticity of driver's

license fell squarely within scope of officer's daily enforcement and investigative duties, and

detective's appearance before court to sign criminal complaint was not quasi-judicial activity).

In the context of civil proceedings, in *K.H.* v. *Morgan*, 914 F.2d 846, 854 (7th Cir. 1990), the

Seventh Circuit held that child welfare workers were not entitled to absolute immunity for their

role in placing a minor in various dangerous foster care situations. The court stated in *dicta*, "We

may assume that a caseworker who initiates a proceeding to remove a child from its parents'

custody, or who executes an order made by a judge in a juvenile proceedings, enjoys absolute

immunity." *Id.*; *see Babcock* v. *Tyler*, 884 F.2d 497, 502 (9th Cir. 1989)(noting that absolute

prosecutorial immunity extends to "child protective services workers who execute court orders

for seizure and placement of a child."); *Hamill v. Wright* 870 F.2d 1032, 1037 (5th Cir. 1989)

(director of county office of domestic relations was absolutely immune from damages under §

1983 with respect to decision to bring contempt proceedings for nonsupport and participation in

those proceedings). The proper concern, as is evident from the analysis in *K.H.*, was not the type

of proceeding but, rather, the defendant's function. And the court distinguished the situation

where a court order commanding the defendant to act was not present: "This is not such a

case--there was a juvenile court proceeding, but the defendants have not pointed to any court

orders commanding them to place K.H. with particular foster parents--and the suggestion that

caseworkers should enjoy absolute immunity merely because they are quite likely to be sued does

not distinguish them from police officers or other public officers whose duties require them to

interfere with people's liberty or property and hence make them natural targets of civil rights

suits." *Id.* at 854. Here, while there is a court order requiring support, there is no court order

commanding the SAO to take any particular action to enforce the support obligations nor had any

23

enforcement action been commenced. The location or identification of the asset and the placement of a lien were merely investigatory and administrative tasks that could have been taken without initiating any court action. As opposed to the actions described in *Babcock* and *Hamill*,[23] Cataldo's activity was not directly connected with a court proceeding. For these reasons, the court concludes that Cataldo is not absolutely immune from liability should plaintiff establish her claims.

## Qualified Immunity

Where a plaintiff claims a violation of federal statutory law, the pertinent qualified immunity inquiry is whether the defendants violated clearly established federal statutes and implementing regulations. *See Cronen v. Dept. of Human Services*, 977 F.2d 934 (5th Cir. 1992). In the context of federal statutory claims, the court must determine whether a reasonable official would know how the statute required the official to act. *See Del A. v. Edwards*, 855 F.2d 1148, 1152 (5th Cir.1988). *See also Jacobs* v. *City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000) ("A clearly established right is one where the contours of the right are sufficiently clear that a

---

[23]There is some authority to the contrary. The Ninth Circuit held in an unpublished decision, *Cash* v. *Los Angeles County Dist. Attorney*, No. 93-56140, 1995 WL 115577, *1 (9th Cir. Mar. 16, 1995), that the Los Angeles District Attorney was absolutely immune from damage liability for the alleged "mishandling of the effort to secure child support payments," finding "that the D.A.'s actions were within the prosecutorial function." Without elaboration of the facts, the court rested its ruling on the D.A.'s authority "to pursue the enforcement of the child support order. The D.A.'s activities in attempting to enforce the child support order are 'an integral part of the judicial process so as to fall within the quasi-judicial function.'" *Id.* (quoting *Babcock*, 884 F.2d at 501-03). *See also O'Sullivan* v. *Saperston*, 587 F. Supp. 1041 (S.D.N.Y. 1984) (assistant corporation counsel as "civil prosecutor" entitled to absolute immunity for actions taken to enforce child support order). This court believes these cases are inconsistent with the reasoning of the Supreme Court and the Seventh Circuit, however, and declines to follow them.

reasonable official would understand that what he is doing violates that right.") (citations, internal quotation marks, and alteration omitted); *McGrath*, 44 F.3d at 570 (stating that the "law at the time of the conduct in question must have been clear in relation to the specific facts confronting the public official when he acted" and that a right is not clearly established until it "has been stated so that reasonably competent officers would agree on its application to a given set of facts") (citations and internal quotation marks omitted). Plaintiff bears the burden of showing that the allegedly violated federal right was clearly established at the time of violation. *See id.*, at 766.

Looking to the pertinent statutory sections and implementing regulations, the court finds that Cataldo violated a federal right clearly established at the time he failed to pursue Wrobel's assets. Title IV-D, as detailed above, requires the establishment of standards for the maintenance of an effective support collection program and compliance with these standards. The implementing regulations clearly require that a noncustodial parent's assets be located (45 CFR § 303.3), that a lien be placed on property of an absent parent who owes overdue child support (45 CFR § 303.103), and that an effective system for the collection of support obligations be maintained (45 CFR § 303.6). Cataldo's alleged failure to investigate and pursue Wrobel's assets establishes a violation of Title IV-D and the regulations. As such, Cataldo is likewise not entitled to qualified immunity.

## CONCLUSION

For the above-stated reasons, the court denies defendants' motion to dismiss treated as a motion for judgment on the pleadings [#64]. A status hearing will be held on June 19,2001 at 9:30 a.m.

Date: May 24, 2001       Enter: _____
                              JOAN HUMPHREY LEFKOW
                              United States District Judge